And we'll call our second case of this morning in re Coastal Broadcasting System number 13-3354, Mr. Garamore, is that correct? Yes, Your Honor. And Ms. Dobin. Good morning, sir. May it please the Court, Joseph Garamore from the Brown and Connery Law Firm, on behalf of the appellants Edwin Rosenfeld and Wilbur Huff. I would like the opportunity to reserve five minutes for rebuttal. I'm going to make a suggestion to you, because I don't perceive that we're going to have a great many questions for your opposing counsel. Why don't we give you the full 15 minutes now, and if we ask her any questions, if you think there should be rebuttal to the issues that we bring up with her, if any, then we can go from there. But why don't we do that, if that's okay with you? That's certainly fine, Your Honor. Okay. So I yield the podium? No, no, no. You go. You wish me to proceed and not have rebuttal, I see. We only have rebuttal if there will be, and we'll add time on, if we really have any significant questions of her that you think you need to rebut. I see. So you have 15 minutes. Very well. At issue in this case is whether multiple provisions of the bankruptcy code can be trumped in a pre-petition agreement, which we contend was misinterpreted by the bankruptcy court. Well, let's just start with the agreement. Where is the misinterpretation? You've got section 3.1 that says, upon or in connection with any reorganization of Coastal, any payment shall be paid or delivered to Sturdy. That's the bank. Then 3.2, it says, if you have anything that comes up in 3.1, if any proceeding described in 3.1, which includes a reorganization, is commenced, Sturdy is irrevocably authorized, in its own name or the names of, in this case Rosenfeld and Huff, or otherwise, to, I can skip down, take any such other actions, including, without limitation, voting the subordinated debt, as it may deem necessary or advisable. It doesn't get any clearer than that. Your Honor, I would take the court back to an earlier portion of the agreement and to examine a little further, more holistically, the structure of the subordination agreement. Yeah, but this is specific, right? Well, it is, but there's a predicate. What predicate is, section 2.2 of the agreement says that, notwithstanding anything in this agreement to the contrary, and then I'll paraphrase to say, unless the debtor was in default. Yeah, they get the payments. Rosenfeld and Huff gets the payments. Correct. And then the beginning of section 3, where the sections which Your Honor quoted from are contained, it begins with the title, in furtherance of subordination. We would suggest to the court that until there is an event of default, which I think on this record is uncontradicted, that the debtor was never in default to its main lender, Sturdy, that the provisions later in section 3. But I never have to get there if I say, in the event of reorganization, Sturdy gets the money and gets the vote, because, in effect, what's happened is there's been a transfer of the interests of Rosenfeld and Huff to Sturdy, right? That's what this whole thing is. But I would say, Your Honor, that until there's a default, those provisions don't come into play. I would say that the predicate to those sections having efficacy is, first, there has to be a default under the loan. And that connects in with the concept of subordination. Subordination is not elimination. It's the secured lender gets paid first. And what I'm saying to you is it doesn't matter if there's a default. It matters if the specific item is noted. And the item is, if there is a, among other things, a reorganization, you can do X and Y. And one of those things is vote, my interests. And, by the way, you don't get any further payments. They come to me. Or if you get them, the next section says, you've got to turn them over to me. And I understand that, Your Honor. If you were trying to draft that, how would you draft it any differently? In order to achieve. You're on the other side. You're representing Sturdy Bank. How would you draft that any differently? The reading that is, the interpretation by the Bankruptcy Court would essentially, the agreement might as well say, in the event of a bankruptcy, Huff and Rosenfeld receive nothing and have no further rights. It could be a paragraph long. That's essentially the reading that's advocated by the Bankruptcy Court. Does it say a whole heck of a lot different? I think it does because I think the court has to look at the prior paragraph. And it's important to understand contextually that there was no default. Sturdy wanted protection in its subordination agreement. It received that protection. Its loan was paid pre-petition. Its loan was paid during the bankruptcy. Its loan, to our knowledge, continues to be paid. There's never been a declared event of default that we've ever made aware of. The planned disclosure statement are replete with evidence of Sturdy's interest continues unimpaired. It's very clear that Sturdy's benefit of its bargain was to be protected. Sturdy's protected, and that's what's troublesome in this case and what I would advance to this court. Sturdy's protected, and that's what's troubling. Secured lenders do everything they can to protect themselves. That's not the trouble in the case. That's what they're there for. No, and I agree. What's troublesome is that that result having already been obtained, the court and the debtor were able to utilize this agreement to instead of protect Sturdy, which was the purpose of the subordination agreement, it was instead used as a vehicle in order to avoid the implications of the absolute priority rule. It allowed the net result of this case was to allow the managing shareholders of the company to retain the interest in the company without paying a penny in new value, while the unsecured creditors, my clients, were completely cut out of the money. They were the only party constituent in the case who received nothing, and indeed they were the largest single constituency in the case. And that fundamentally violates principles of the bankruptcy code. You brought up three arguments in the bankruptcy court, and then you renewed these three before the district court. The plan wasn't feasible, that the claims were improperly classified, which is, in effect, what you just alluded to a moment ago, and the agreement didn't entitle Sturdy to vote the claims. We started off by talking about number three. The thing that would, to me, that was interesting about this case, had it been brought up, is whether even if the agreement entitled Sturdy to vote the claims, whether that violated the bankruptcy code, because there's like four cases that go one way and four that go the other. There's no circuit court that's decided that. But you didn't bring that up in the bankruptcy court, and the district court said that you had waived it when you brought it up there. Isn't that particular argument waived? Well, that's certainly what the district court said, and we would respectfully disagree. Tell me how it's not waived. I would say the primary reason it's not waived is because the issue of the import, the subordination agreement, was literally raised sua sponte by the bankruptcy court at the close of the day-long confirmation hearing. And we cited in the record to the point in the transcript which the court said. But isn't it really up to you to bring that up to the court? In other words, you're saying we read 3.2 differently in light of 2.2, didn't really grant a voting right if there wasn't a default. That's your argument. But, by the way, the next argument would be even if that occurred, because it's the argument made to the district court, even if that occurred, then it was a violation of the policy of the bankruptcy code. But you didn't make that argument to the bankruptcy court. We literally, counsel at the confirmation, literally lacked the opportunity to make that argument, and I would say. How did you lack the opportunity to make that argument? The issue was not presented before. Isn't it up to you to make that presentation to the court? I mean, you've got some decent cases. You've got a really good bankruptcy judge, Judge Weedoff, on your side. And the argument wasn't made. Judge, I can't overstate enough to this panel the game-changing nature of what happened at the close of the confirmation hearing. And what I would really cite the court to is if this argument was so plain, it's interesting to note that neither the debtor nor Sturdy ever raised it. This was an 18-month confirmation process. There was a motion to dismiss. What did Sturdy want to raise? It's against them. Maybe I'm misunderstanding the question. No one raised the impact of the subordination agreement. No one read the subordination agreement to give the rights that the bankruptcy court gave in this case until the judge made his determination at the close of confirmation and in her memorandum of opinion. No one argued. Despite those competing plans, there was a motion for relief, a motion to dismiss, proofs of claim filed by my clients. If at any point either Sturdy or the debtor said, whoa, whoa, whoa, stop. No one has a right to make any of these filings except for us, Sturdy, because we hold those claims. We own those rights. They never raised that argument to the bankruptcy court. Sturdy or Coastal submitted a plan and a disclosure statement. Correct. The plan put you into a class four, and you thought you belonged in class three. You made three objections, that your claims were impaired, thus entitling you to vote. And so you focused on the voting, that you were improperly classified, and that the plan wasn't feasible under 1129. You didn't discuss even there the implications of the agreement, did you? We did not, nor did the debtor, nor did Sturdy. But isn't the ball in your court to bring it up at the outset? I would respect that. If you're going to object to a plan, I mean, I've been through this. You throw everything you can against the wall, and then you sort it out later on as the ones you really want to go and present to the court and focus your time on. These are the ones you decided to do. And I agree with that as a general position of strategy, but I literally can tell this court that the record, I think, is clear, that there was the first time that the idea, that the subordination agreement allowed Sturdy to vote my client's claims, literally occurred at the close of the confirmation hearing. Because the court spotted an issue that it thought you should have brought up, whether Sturdy was entitled to vote on behalf of the objectors under Section 3.2 of the agreement. And I would say to the court that if that was really what the debtor believed or what Sturdy believed, I would have thought that those points would have been made in the plan or in the disclosure statement or in arguments for and against. Take a step back. When do you think there's a waiver? I'm sorry? When do you think generally there's a waiver? Forget this case. I think in general it's when there's an intentional relinquishment of a known right. And I would say that this interpretation was not a right. But for appellate purposes, it's not bringing up something that you could bring up, in effect. I'm saying it more in lay language, but isn't that correct? I think that's correct, Your Honor. Okay. So you could have brought up what the court brought up post or at the end of the confirmation hearing and had it post-confirmation hearing, but you didn't. Post-confirmation hearing? Well, that is whether you had the right, whether Sturdy had the right to vote under the agreement or otherwise. Or was there something that precluded it from having that right to vote, even if it was given that right to vote? And you only brought that up to the district court on the latter one. We – In fact, you're saying the code prohibits as a matter of policy the granting to another of your right to vote as a creditor. Correct. And I would say that – But that's your new argument. That's your new argument. You never argued before that the assignment was prohibited by the code. We certainly did not, Your Honor. And again, I would point to the clear reason why this was never raised by my clients below was because it was never raised by any party below. It's your call. But isn't it true that the court invited you to file a brief and address the relevant provisions of the subordination agreement and the applicability slash enforceability in this case? And you could have filed a brief before the court ruled. Well, the court did give Bankruptcy Council a limited opportunity to address the subordination agreement itself. But that opportunity was limited temporarily and it was limited in scope. And I think the judge, the bankruptcy judge – Well, why did this particular issue? And your friend on the other side responded and you did not. Well, I think both sides made brief submissions. Well, brief submissions as to this – not as to this issue. The submissions were based factually on the interpretations of the agreement within the four corners of that document, which I understand. And I wasn't counsel for these appellants at the bankruptcy court, so I can't speak on firsthand knowledge. But my understanding was it was based narrowly on what the agreement said. And I would submit just as a counterpoint, all the cases that we cited in that brief, including Judge Weadov's opinion in the 203 LaSalle case, most of those cases, with perhaps one exception, there the issue of the effect of the subordination agreement was raised in a pre-confirmation motion setting. There was a declaratory judgment action. Someone sought to enforce those rights. And my only point is, shouldn't that have been done here? And I would only – If you've got an arrow in your quiver, why give it away? Because in order to raise that – if anyone perceived that issue, and it seems that no non-legal agents did, it would have necessitated the parties to – it would have necessitated our clients to create an argument that no one perceived that would be disfavorable in order to set up the straw man to knock it down. I see my time has expired. Thank you very much. Thank you. Now, Ms. Dobin, is there anything that you wish to note on your own? I'm not sure that we have a whole lot. I may have one question for you, but do you – is there anything that you think you need to really deal with? I do, Judge. First of all, Andrea Dobin, Trank De Pasquale, appearing on behalf of the debtor, Coastal Broadcasting. I would point, Your Honor, in looking at the language of Section 2.2 of the subordination agreement, the issue of event of default was discussed by Mr. Garamore in his presentation. I'd point out a couple of issues with regard to that concept. Event of default in virtually every loan document known to man involves if the debtor is sued, and it needs to be pointed out that the appellants in this case sued this debtor pre-petition, thereby triggering an event of default. So I believe that the argument regarding whether or not an event of default occurred or had been noticed by the bank – Does that argument make any difference in light of Section 3.2? I don't believe it does, Judge, but I did want to point that out. I also want to point out the language of 2.2 that says that these – the appellants would be entitled to their regularly scheduled payments, and that would not encompass payments under a plan, and that's what we believe that Section 3.2 interprets, that when you work your way through the agreement, the beginning portions of the agreement is sort of the regularly scheduled workings of the subordination agreement, and when you get to the later section of the agreement, you talk about what happens in the event of liquidation, reorganization, or other kinds of unusual events occurring for this debtor. I also – I guess when you get to the end, you just say, well, appellants were each owed over $800,000 by Coastal, and their rights were completely extinguished by your client's decision to file for Chapter 11 reorganization, and they didn't even get to vote on the plan. It just seems a little unfair. Tell me why that is not so. I believe there are a lot of things that happen in a bankruptcy that are unintended consequences of prepetition acts, and the subordination agreement, as has been pointed out, is very carefully tailored to protect the right of the bank in the event of distress of this debtor. And I do not believe, putting aside the 203 LaSalle case and some of the cases that have followed it, that there is anything special in the bankruptcy code that puts the right to vote above the right of 510A specifically speaks to the enforcement of subordination agreements within the confines of the bankruptcy code, suggesting that, in fact, subordination agreements are to be honored regardless of the way in which things fall out thereafter. And I think the use of the language in 510A about enforceability under non-bankruptcy law is critical here because I think that what is required is that the parties looking and the courts looking at subordination agreements need to determine whether those subordination agreements are enforceable outside the context of the bankruptcy code. If they are enforceable under state law, they pass the test of consideration, duress, and all other state court, state law defenses to contract, that if they pass that muster, that when they become part of the bankruptcy process, they are to be enforced according to their terms. I think there's a sense that your friend across the aisle may be making the suggestion, which hasn't really been fleshed out, that they were hoodwinked into signing the agreement. And so that would be under non-bankruptcy law, I suppose, if there's any merit to that. Indeed, Judge, but unfortunately it was never raised below. And there's a suggestion on the record today and historically that somehow this issue regarding the voting rights was somehow they were blindsided at confirmation. And I'd point out a couple of things. As Judge Ambrose pointed out, the subordination agreement itself is referenced in the plan. It is seeking to be enforced in the plan, a particular provision of it, to be sure, and not the voting. And that's because the structure of the plan by debtors' counsel was to treat that class of creditors as unimpaired, so the issue of voting rights was not front and center. But in fact, declaring them as unimpaired did, by virtue of the implication of the bankruptcy code, strip these creditors of their voting rights. So the issue of voting rights was in and of itself front and center. Certainly the treatment under the subordination agreement of voting rights was not something that was discussed at length, but there was a remedy available. These creditors were quite active in the process. They filed a motion for state pending appeal. While at the same time they could have issued a motion for reconsideration, if they believed that there was a legal error made at the time of confirmation, there was a practical and procedural mechanism to bring that matter forward. And so we do believe that waiver was appropriate, although, as noted in our papers, like the district court did, we also addressed those facts as well. Judge Ambrose believed I had nothing further to add to my paper, so if the panel has nothing further for me, I'll certainly cede the podium. Mr. Garamore, I said if your opposing counsel makes an argument, you have a right to attempt to rebut it. Do you wish to have a rebuttal? Just very briefly. Okay, we'll give you two minutes. Thank you. Opposing counsel refers in the briefs and to some extent in argument to a preordained result imposed by the execution of the subordination agreement. The court's questions have noted the concern about whether there was some hoodwinking that occurred, which clearly was not developed on the record before the bankruptcy court because no one apprehended the term that the interpretation of the subordination agreement would have on the plan. But what I would say is there's a broader policy here, which I have to advance to the court, which is voting is one of the cornerstones of a Chapter 11 process. And we believe that the case law, such as the 203 LaSalle case and the other cases that follow that. You can give away constitutional rights, can you not? In certain settings, yes. And so why can't you give away a right to vote when you assign to another your interest in something? That's not a constitutional right, is it? I don't think it's a constitutional right. I think it's a statutory right. I think that it's just one of a panoply of provisions in the bankruptcy code, which are designed to prevent the result that obtained here, which is to allow a senior lender and equity to squeeze out the party in the middle, which is exactly what occurred here. A senior lender has said that, I mean, it's getting the payments. If the payments went to you or go to you in any way, what do you stand to gain from any of this? We would advance. Even if you could vote? We are recognizing that bankruptcy is a process of negotiation. We believe that there's room in equity. You would have just gone to another provision of 1129, you'd have had a cram down, right? There would have been an attempt at a cram down, and we think we would have successfully defeated the plan or would have been in a position to resolve it in a manner that would have been protective of my client's interests. Thank you. Thank you. Thank you to both counsel. We'll take the matter under advisement.